**IN THE DISTRICT COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. CROIX**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CRIM. NO.: 1:10-cr-00024 |
| v. | ) | |
| | ) | |
| JOSE A. MURRAY, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

Finch, Senior Judge

THIS MATTER comes before the Court on Defendant Jose Murray's Motion to Suppress. While searching for a shooting suspect in the bush behind the John F. Kennedy Terrace housing community, members of the Virgin Islands Police Department observed an individual who matched the description of the shooting suspect standing outside of a makeshift wooden structure. Police approached that man, Defendant Jose Murray, and questioned him. After learning that he was armed, police arrested him. They subsequently discovered a gun, bullets, a vial of crack, and cash on the person of the Defendant. Police also found marijuana plants outside the wooden structure and a substantial sum of cash stuffed in a pillowcase inside the structure. Defendant now seeks to suppress that evidence and statements that he allegedly made to police on the basis that police were unlawfully on his property when they first observed him and that all evidence found after that was a result of warrantless search in violation of his Fourth Amendment rights. The Government contends that Defendant lacks standing to contest the alleged search because he was "squatting" on private property and therefore has no

reasonable expectation of privacy. In the alternative, the Government argues that the encounter between police and Defendant was consensual and therefore not a search for Fourth Amendment purposes. Police also argue that when they first saw Defendant, they had reasonable suspicion to briefly detain him to determine whether he was armed.

## I. **Facts**

At approximately 10:30 A.M. on March 31, 2010, the Virgin Islands Police Department ("VIPD") was alerted to reports of shots being fired in the vicinity of buildings 20 and 21 of the Harbor View Apartments and that suspects had fled the area heading into the Orange Grove and John F. Kennedy Terrace ("JFK") areas. (Suppression Hr'g Tr. 5-7, July 15, 2010.) Numerous concerned citizens called 911 and reported that they had seen several individuals involved in the shooting, including a black male who "might have braids or locks," wearing a white t-shirt and dark pants and running away on foot. (*See* Virgin Islands Emergency Call Center Call History Record, Incident # STX10CAD007662 at 3, Def.'s Ex. I.)

Officer Orlando Benitez, a member of the VIPD Bike unit, was dispatched to search the Harbor View Apartments on an all terrain vehicle (ATV).[1] (Hr'g Tr. 5:10-6:22.) After learning from central dispatch that the suspect had fled on foot to the Golden Rock and JFK Area, Officer Benitez headed to the JFK area. (*Id*. at 6:23-7:12.) While searching near building 20 of the JFK Terrace, Officer Benitez observed a light complexioned black male wearing a white t-shirt and

---

[1] Officer Benitez testified that, while searching for the suspects, he engaged his ATV's police lights.

jeans.[2]  The individual saw Officer Benitez and fled on foot into the "bush" toward the western side of JFK Terrace. Officer Benitez then radioed the description of the suspect and the area in which he observed him to central VIPD dispatch.  (*Id*. at 7:13-8:12.)  He attempted to follow the suspect on his ATV but was blocked by a concrete barrier.  While navigating around the barrier, Officer Benitez lost sight of the suspect "in the bush."  (*Id*. at 8:13-8:20.)

VIPD Officers Robin Richards and Rolando Huertas, who had also been dispatched to search for the suspects, heard Officer Benitez's report and headed to the JFK Terrace from the Golden Rock area.  (*Id*. at 14:13-15:16.)  When they arrived at JFK, they entered through the entrance across from Golden Rock, which was in the vicinity of building 7, and immediately proceeded into the bush.  (*Id*. at 15:9-16:1; 18:5-17.)  While in the bush area behind building 7, Officers Richards and Huertas observed a wooden "makeshift" shack.[3]  (*Id*. at 19:24-20:2.)  Outside the shack was a light complexioned black male with long dread locks, wearing a white t-shirt and grey pants.[4]  (*Id*. at 20:3-14.)  Officers Richards and Huertas approached the Defendant and asked him if he had anything on him that "we need to know about."[5]  (*Id*. at 20:15-19.)

---

[2] While the Government's opposition brief implies that the individual seen fleeing by Officer Benitez was the Defendant, Benitez did not identify the Defendant in Court and the Government offered no other evidence to support this inference.

[3] At the hearing, Defendant submitted into evidence several photographs of the shack and the surrounding area.  Defendant contended that these photographs showed that the wooden shack was entirely surrounded by a fence.  The pictures, which were somewhat inconclusive on this issue, did show that at least part of the area near the wooden structure was surrounded by a makeshift barrier composed of chain link and wire fence with an open archway partially covered by a wooden plank painted with the words "Keep Out." (*See* Def.'s Ex. B, and H.)

[4] At the hearing, Officer Richards identified this individual as the Defendant.

[5] Officer Richards testified that he and Officer Huertas approached Defendant together with their guns holstered.  Defendant testified that only Officer Huertas approached him and that he had his gun out but pointed at the ground when he approached Defendant.  The Court finds that both Richards and Huertas approached the Defendant with their guns holstered.  However, as

Defendant responded that he had "a steel" on him.  Officer Richards then asked what he meant by "steel" and Defendant replied "a gun."  (*Id*. at 20:20-25.)

Upon hearing Defendant state that he possessed a firearm, Officer Richards and Huertas placed Defendant under arrest and read him his *Miranda* rights. (*Id*. at 21:1-5.) After mirandizing him, they asked Defendant if he had anything else on him to which Defendant replied that he had "dope" and bullets. (*Id*. at 21:13-20.)  One of the officers searched Defendant and, in his pockets, found a vial of crack, bullets wrapped in clear plastic, and $177 in U.S. currency.  They also found a gun in a holster tucked into Defendant's waistband.  (*Id*. at 21:22-22:22.)  Officers Richards and Huertas asked if he had any other drugs and Defendant stated that he had some marijuana plants.  They then found twelve marijuana plants growing in a plastic container in the vicinity of the wooden shack.  (*Id*. at 23:5-19.)  Defendant stated to the police that he was living in the wooden structure and was growing marijuana "for his business."  (*Id*. at 24:5-25:5.)  While Officers Richards and Huertas were escorting Defendant away from the wooden structure, Defendant stated that he had money stored in a white sock inside a pillowcase in the structure. At the behest of Defendant, one of the officers entered the wooden structure and found approximately $1,000 in the location that Defendant had described. (*Id*. at 25:6-24.)

Defendant testified at the July 15, 2010 hearing and stated that he resided in the wooden structure and had done so for three to six months. (Hr'g Tr. 33:2-14.)  Defendant described the wooden structure as being built "with pallets . . . a little two-by-four roof, some little carpet over the top, and a wooden door with a gate before you enter, chained, to cover up the door [and] one

---

discussed in Section II(b), resolution of Defendant's motion would be the same regardless of which set of events is correct.

window." (*Id*. at 33:4-10.)  Defendant had a key to the lock used to chain up the door.  (*Id*. at 35:3-4.)  Defendant testified that he did not know who owned the property (*id*. at 46:3-4), but was living there with the permission of another individual, a Rastafarian male named "Aliko," who lived in the wooden structure for "probably like four years, three years." (*Id*. at 51:9-20.) While corroborating some of Officer Richards' testimony, Defendant denied telling police that they could enter his house for the purpose of retrieving the money found in his pillowcase.  (*Id*. at 39:5-7.)

A second hearing was held on July 29, 2010.[6]  At that hearing, Nancy Chen testified that she has owned Plots No. 2 and 3, Estate Golden Rock for the last eight years.  She described these plots as being the land between the road and extending all the way to JFK Terrace including the bush area behind building 7 of the JFK Terrace.  Ms. Chen testified that she has never given permission to anyone to occupy the property or construct any wooden structures. She testified that she had made an attempt to "clean up" the property to make it attractive to potential purchasers but that she had been told by the Department of Public Works that she needed to first obtain a permit.  She stated that she had been by the property but had never observed the wooden structure.

---

[6] On July 22, 2010, the Court *sua sponte* ordered that "a hearing on the issue of Defendant's standing to contest the alleged search" take place and ordered that the parties file supplemental briefs on the issue of Defendant's standing.  (*See* Order Requesting Further Briefing and Setting a Supplemental Hearing on Issue of Defendant's Standing to Contest Search, Doc. 12.)  This hearing was held on July 29, 2010.

## II.   Discussion

Defendant argues that police were unlawfully on his property when they observed him standing outside his door and that everything found as a result of that observation must be suppressed.  The Government responds that because Defendant was a squatter, he had no lawful right to be on the property and he therefore lacked a legitimate expectation of privacy.[7]  The Government also argues that the encounter between police and Defendant was consensual and that even if it was not, police had sufficient reasonable suspicion to approach Defendant and question him.  They argue that the evidence obtained after Defendant's arrest was the result of a lawful search and that Defendant's post-*Miranda* statements were voluntary.

### a.  Standing Under the Fourth Amendment

For over a century, the Supreme Court has held that "remedies for violations of constitutional rights [are] only [] afforded to a person who 'belongs to the class for whose sake the constitutional protection is given.'"  *United States v. Salvucci*, 448 U.S. 83, 86 (1980) (quoting *Hatch v. Reardon*, 204 U.S. 152, 160 (1907)).  "[I]t is entirely proper to require of one who seeks to challenge the legality of a search as the basis for suppressing relevant evidence that he . . . establish, that he himself was the victim of an invasion of privacy." *Id*. (citation omitted).  In other words, "[t]o invoke the Fourth Amendment's exclusionary rule, a defendant must demonstrate that his own Fourth Amendment rights were violated by the challenged search or seizure." *United States v. Stearn*, 597 F.3d 540, 551 (3d Cir. 2010) (citing *Rakas v. Illinois*, 439 U.S. 128, 132-133 (1978)); *see also United States v. Baker*, 221 F.3d 438, 441 (3d Cir. 2000)

---

[7] A squatter is "one who settle's on another's land without legal title or authority."  See Black's Law Dictionary 1258 (5th ed. 1979).

(quoting *Rakas*, 439 U.S. at 133-134) ("Fourth Amendment rights are personal rights, which, like some other constitutional rights, may not be vicariously asserted.")

"The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure."[8] *Rakas,* 439 U.S. at 132, n.1; *United States v. Acosta*, 965 F.2d 1248, 1256, n.9 (3d Cir. 1992) (same); *Stearn*, 597 F.3d at 551 ("[T]he proponent of a motion to suppress 'bears the burden of proving not only that the search . . . was illegal, but also that he had a legitimate expectation of privacy in [the place searched].'" (quoting *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980))); *United States v. Johnson*, 584 F.3d 995, 998 (10th Cir. 2009) ("The burden of proof is on the defendant to demonstrate that he has a reasonable expectation of privacy in the place searched to establish his standing." (citation omitted)); *United States v. Xavier*, 2010 WL 446917, at *3 (D.V.I. February 2, 2010) (Finch, J.) (denying motion to suppress because defendant "failed to carry his burden of showing . . . that he actually believed that he had an expectation of privacy at the searched residence or that his expectation was the type that society is prepared to recognize as reasonable.").

---

[8] This Court was well within its jurisdiction to raise the issue of Defendant's standing to contest the alleged search *sua sponte.* While the Government may stipulate or concede Defendant's standing (*see Stearn*, 597 F.3d at 552, n.11), it has not done so here and this Court is obligated to enforce the parties' burdens of proof. Moreover, numerous other district courts have also raised standing to contest a search *sua sponte*. *See United States v. Francis*, 646 F.2d 251, 254 (6th Cir.1981) (noting that the district court had considered the issue of Fourth Amendment standing *sua sponte*); *United States v. Matthews*, 615 F.2d 1279, 1282 (10th Cir. 1980) (noting that the district court raised the issue of Fourth Amendment standing *sua sponte*); *United States v. Tranquillo*, 606 F.Supp.2d 370, 372 (S.D.N.Y. 2009) (raising standing to assert Fourth Amendment challenge *sua sponte* and ordering parties to "submit simultaneous, supplemental memoranda on the issue of [defendant's] standing under the Fourth Amendment to challenge the legality of the search."); *United States v. Newton*, 210 F.Supp.2d 900, 904 (E.D. Mich. 2002) (court raised issue of defendant's standing *sua sponte* at motion to suppress hearing); *United States v. Sierra-Nino*, 1986 WL 5455, at *1 (S.D. Tex. 1986) (recounting that district court had "*sua sponte* raised the question of this Defendant's standing to challenge the stop of the pickup in which he was neither driving nor riding.").

"Determining whether a plaintiff has standing to challenge a search equates to determining whether the plaintiff has a reasonable expectation of privacy in the property searched." *United States v. Varlack Ventures, Inc.,* 149 F.3d 212, 215 (3d Cir. 1998) (citing *Rakas,* 439 U.S. at 143). "The standing inquiry, in the Fourth Amendment context, is shorthand for the determination of whether a litigant's Fourth Amendment rights have been implicated." *Stearn*, 597 F.3d at 551 (citation omitted). Standing to challenge a search requires that the party challenging the search have both an objectively and subjectively reasonable expectation of privacy in the property searched. *Baker*, 221 F.3d at 441 (citing *Rakas,* 439 U.S. at 143 and *California v. Greenwood,* 486 U.S. 35, 39, 108 (1988)). In other words, the Defendant must actually believe that he has an expectation of privacy, and this expectation must be the kind that "society is prepared to recognize as reasonable." *Rakas*, 439 U.S. at 143, n. 12.

The Government correctly admits that the evidence is sufficient for the Court to find that Defendant had a subjective expectation of privacy in the wooden structure. (*See* Gov.'s Supplemental Brief at 2-3.) Defendant testified that he resided in the wooden structure with the permission of its occupant at the time, a Rastafarian named "Aliko," whom Defendant understood to have resided there for three or four years. Defendant also testified that the shack was secured with a locking door to which he had a key and submitted pictures showing that the shack was at least partially surrounded by a fence and a sign that read "Keep Out." This is sufficient to show that Defendant actually believed that he had an expectation of privacy in the shack. *See Whiting v. State*, 885 A.2d 785, 802 (Md. 2005) (finding that squatter maintained subjective expectation of privacy in bedroom in part because he "kept people out of the bedroom . . . by means of a lock on the door for which only he had the key."); *see also United States v.*

*Speights*, 557 F.2d 362, 363 (3d Cir. 1977) (finding that police officer had subjective expectation of privacy in locker at police headquarters that was secured with a personal lock but lacked objectively reasonable expectation of privacy).

However, "[t]he Fourth Amendment does not protect all subjective expectations of privacy, but only those that society recognizes as legitimate." *Wilcher v. City of Wilmington*, 139 F.3d 366, 374 (3d Cir. 1998) (internal quotations omitted); *see also Greenwood*, 486 U.S. at 39-40 ("An expectation of privacy does not give rise to Fourth Amendment protection, however, unless society is prepared to accept that expectation as objectively reasonable."). "Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." *Rakas*, 439 U.S. at 143, n. 12.[9] Thus, there are two avenues to support the reasonableness of Defendant's claim of privacy in the wooden structure: concepts of property law and societal understandings of privacy.

Defendant has not met his burden of showing that his expectation of privacy is based on "concepts of real [] property law." *Rakas*, 439 U.S. at 143, n. 12. The evidence showed that Defendant was residing in a wooden structure located on land owned by Nancy Chen, who testified that she had never given permission for Defendant, Aliko, or anyone else to live there.

_____

[9] Following *Rakas*, both the Supreme Court and the Third Circuit have repeatedly held that property concepts are useful in determining the legitimacy of a person's expectation of privacy. *See, e.g., Georgia v. Randolph*, 547 U.S. 103, 111 (2006) ("The constant element in assessing Fourth Amendment reasonableness in the consent cases, then, is the great significance given to widely shared social expectations, which are naturally enough influenced by the law of property, but not controlled by its rules."); *Acosta*, 965 F.2d at 1256 (noting that "property law is not irrelevant to the [standing] inquiry . . . Recent cases [] reflect the Supreme Court's continued consideration of property interests in determining Fourth Amendment privacy interests.") (citing cases).

Under Virgin Islands law, as in many other if not all jurisdictions, entering on the land of another without their consent is trespass. *See, e.g.*, 14 V.I.C. § 1741 ("whoever enters upon the land of another without the consent of the owner or of the person in charge thereof" is guilty of trespassing); *see also People v. Fisher*, 2 V.I. 395, 399 (Terr. Ct. 1953) (upholding criminal trespass conviction under section 1741 of person who entered house "without [owner's] permission or the permission of anyone else authorized to give such permission."); *Stitt v. Holland Abundant Life Fellowship*, 614 N.W.2d 88, 91 (Mich. 2000) (defining a trespasser as one "who enters upon another's land, without the landowner's consent."); *see also* Restatement (Second) of Torts § 158 (a trespasser is one who intentionally "enters land in the possession of the other.");[10] Black's Law Dictionary 1347 (5th ed. 1979) ("trespass to land" defined "[a]t common law" as "every unauthorized and direct breach of the boundaries of another's land . . . No intent to commit a trespass was required."); *but see People v. Schafer*, 946 P.2d 938, 942 (Colo. 1997) (finding that a backpacker who had slept in a tent on unmarked and unfenced private land had standing to contest the search of his tent by police because, by Colorado statute, "one who enters or remains upon unimproved and apparently unused land, which is neither fenced nor otherwise enclosed in a manner designed to exclude intruders, does so with license and privilege in the absence of personal or posted notice.") (citing Colo. Rev. Stat § 18-6-116(1) (1986)).[11] Because Defendant was a trespasser, he had no legitimate expectation of privacy. *United States v. Hunyady*, 409 F.3d 297, 302 (6th Cir. 2005) (rejecting defendant's argument that

---

[10] The Restatement states that "a person who is in possession of land includes only one who . . . has the right as against all persons to immediate occupancy of land." Restatement (Second) of Torts § 157(c). Thus, Ms. Chen did not have to physically occupy the land in order to be in possession of it.

[11] This Court is unaware of any similar Virgin Islands statute applicable to *private* land. *Cf.* 12 V.I.C. § 402(a) (2010) (recognizing right of the public "to use and enjoy the shorelines of the United States Virgin Islands.") (emphasis added).

he had a legitimate expectation of privacy because he was "a trespasser under Michigan law at the time of the search in question.").

Defendant's claim that he lived in the wooden structure with permission "from a person he knows to have lived there for four years" (*see* Def.'s Supplemental Brief at 3) does not significantly mitigate his status as a trespasser.  *See Brown Jug, Inc. v. International Broth. of Teamsters, Chauffeurs, Warehousemen & Helpers of America, Local 959*, 688 P.2d 932, 938 (Alaska 1984) ("An intentional entry onto the land of another constitutes intentional trespass even if the trespasser believes that he or she has the right to be on the land."); Restatement (Second) of Torts § 163 cmt. b (to state claim for civil trespass, "[i]t is [] immaterial whether or not he honestly and reasonably believes that the land is his own, or that he has the consent of the possessor or of a third person having power to give consent on his behalf, or that he has a mistaken belief that he has some other privilege to enter.").  Likewise, the three to six month period of Defendant's residency does not alter his status as a trespasser.  *See United States v. Gowdy*, 2009 WL 89671, at *2 (E.D. Pa. 2009) (holding that trespassing defendant lacked "any reasonable expectation of privacy in the room(s) he occupied" even though he "had been living in the vacant club premises for almost two months with everything he owned."); Restatement (Second) of Torts § 158 cmt. m ("An unprivileged remaining on land in another's possession is a continuing trespass for the entire time during which the actor wrongfully remains.").  Accordingly, Defendant's claimed expectation of privacy finds no basis in concepts of property law.

Second, Defendant has not established that his subjective expectation of privacy in the wooden structure and its curtilage is one "that society recognizes as legitimate."  *Wilcher*, 139

F.3d at 374.[12]    Critical to any legitimate claim of privacy, i.e. one that "society is prepared to recognize as reasonable," is that the presence of the Defendant in the searched premises be lawful. *Rakas*, 439 U.S. at 143, n. 12 (noting that a "wrongful" presence "is not one that society is prepared to recognize as reasonable." (quoting *Katz v. United States*, 389 U.S. 347, 361 (1967))); *United States v. Jacobsen*, 466 U.S. 109, 122 n.22 (1984) (same); *United States v. Phillips*, 382 F.3d 489, 497 (5th Cir. 2004) (finding no expectation of privacy because "[defendant] cannot show that he was legitimately in the Thompson yard because Thompson never gave him permission to use the shed; as to the shed, [defendant's] presence was wrongful."); *United States v. Gale*, 136 F.3d 192, 195 (D.C. Cir. 1998) (defendant, who was "without legal authority" to reside in apartment, lacked "legitimate expectation of privacy in the premises required to challenge the search."). Here, Defendant was without permission from the owner or one who had authority to consent to his presence. As such, his presence was unlawful and he therefore lacked an expectation of privacy that society considers legitimate. [13]

---

[12] There is "no talisman that determines in all cases those privacy expectations that society is prepared to accept as reasonable. Instead, the Court has given weight to such factors as the intention of the Framers of the Fourth Amendment, the uses to which the individual has put a location, and our societal understanding that certain areas deserve the most scrupulous protection from government invasion." *O'Connor v. Ortega*, 480 U.S. 709, 715 (1987).

[13] Defendant cites *Stoner v. California*, 376 U.S. 483 (1964), *O'Connor v. Ortega*, 480 U.S. 709 (1987) and *Minnesota v. Olson*, 495 U.S. 91 (1990) for the proposition that a defendant can have a reasonable expectation in property that he does not own. This is certainly true. However, in each of those cases, and unlike here, the defendants' expectation of privacy was derived from their lawful presence on the searched property. *Stoner*, 376 U.S. at 489 (search of defendant's hotel room violated defendant's expectation of privacy); *O'Connor*, 480 U.S. at 719 (in section 1983 case, search by hospital staff of doctor's office that he maintained for 17 years violated doctor's expectation of privacy); *Olson*, 495 U.S. at 98 (search of home where defendant was an overnight guest of owner violated Fourth Amendment because "society recognizes that a houseguest has a legitimate expectation of privacy in his host's home.").

Furthermore, this Court's research indicates that virtually every court to consider the issue has found that a squatter lacks standing to contest a search of the structure in which he or she is squatting. *See Zimmerman v. Bishop Estate*, 25 F.3d 784, 787-78 (9th 1994) *cert. denied*, 513 U.S. 1043 (1994) (finding that "squatters in a shack on property owned by the Bishop Estate of Hawaii" had no standing to assert civil rights claims under 42 U.S.C. § 1983 for alleged warrantless entry onto property by police); *United States v. Dodds*, 946 F.2d 726, 728-729 (10th Cir. 1991) (holding that squatter had no "standing" to challenge the search of an abandoned apartment where he sometimes slept because his "expectation of privacy in an apartment in which he had no interest . . . would not be one that could be accepted by society."); *United States v. Ruckman*, 806 F.2d 1471, 1472-74 (10th Cir. 1986) (squatter lacked privacy expectation to challenge search of cave in which he resided on federal land in Utah); *Amezquita v. Hernandez-Colon*, 518 F.2d 8, 11-12 (1st Cir. 1975) *cert. denied*, 424 U.S. 916 (1976) (squatters on farmland owned by Commonwealth of Puerto Rico lacked Fourth Amendment reasonable expectation of privacy to support injunction protecting their homes); *Gowdy*, 2009 WL 89671 at *2 ("[T]he circumstances of the conditions under which Mr. Gowdy did live there do not persuade the Court that as a 'squatter' Mr. Gowdy had any reasonable expectation of privacy in the room(s) he occupied."); *United States v. Gutierrez-Casada*, 553 F.Supp.2d 1259, 1270 (D. Kan. 2008) ("Because a person can have no reasonable expectation of privacy in premises on which they are wrongfully present . . . one's status as a trespasser or squatter excludes that person from the protection of the Fourth Amendment."); *Abrams v. Morial*, 968 F.Supp. 1106, 1111 (E.D. La. 1997) (citing *Amezquita,* 518 F.2d at 13) ("It is generally accepted that a squatter has no protected liberty or property interest in the property he occupies unless of course some aspect of state law vests him with such an interest."); *Commonwealth v. Williams*, 900 N.E.2d 871, 877

(Ma. 2009) (holding that squatter's "mere presence on the property does not create a reasonable expectation of privacy.") (collecting cases); *Whiting v. State*, 885 A.2d 785, 802 (Md. 2005) (finding that squatter who "neither lawfully owned, leased, controlled, occupied, nor rightfully possessed" searched premises lacked standing to challenge search.); *Commonwealth v. Gordon*, 683 A.2d 253, 259 (Pa. 1996) (holding that squatter had no standing to challenge search of abandoned house where he was staying); *State v. Linton*, 812 A.2d 382, 383 (N.J. 2002) (stating that "defendant, at best a transient squatter, had no constitutionally-reasonable expectation of privacy."); *People v. Satz*, 71 Cal.Rptr.2d 433, 435 (Cal. App. 1998) (holding that hotel occupant "not legitimately on the premises" was a trespasser and therefore "has no legitimate expectation of privacy in the room, or an expectation that society is prepared to recognize as reasonable.") (internal quotations omitted); *People v. Thomas*, 45 Cal. Rptr.2d 610, (Cal. App. 1995) (finding no expectation of privacy "in a 4-sided, 4 foot by 12 foot 'residence' made of wooden pallets and heavy cardboard and propped against the wall of a building" located on a public street); *but see United States v. Martin*, 2010 WL 200012, at * 4 (D. Utah 2010) (finding that defendant, who was living in a house in foreclosure without paying rent or signing a lease, had a reasonable expectation of privacy because he "was invited to stay at the home by one with the apparent authority to do so."); *State v. Dias*, 609 P.2d 637 (Hawaii 1980) (finding that squatters on government property had expectation of privacy because "of the fact that "Squatters' Row" on Sand Island has been allowed to exist by sufferance of the State for a considerable period of time.").

Defendant's best argument for the reasonableness of his expectation of privacy is that he was given permission to live in the shack from someone whom he believed had been living there

for three or four years. *See, e.g., Martin,* 2010 WL 200012, at *4 (finding that defendant had

reasonable expectation of privacy in bedroom of foreclosed on house because he "was told he

could live at the home by Ms. Sheridan, whom he believed had the authority to extend such an

invitation.");[14] *Cross v. Mokwa*, 547 F.3d 890, 902 (8th Cir. 2008) (dissent) (noting that the

"wrongful presence for which a defendant [does] not have a legally protected expectation of

privacy, involve[s] situations where the defendant knew his presence to be unlawful.") (citing

cases); *but see Zimmerman v. Bishop Estate*, 25 F.3d 784, 787-88 (9th Cir. 1994) ("A guest has

no greater expectation of privacy than does the person that gave them permission to stay there.").

Assuming that, in certain circumstances, permission from an established resident who actually

lacks the right to be on the premises could give rise to an expectation of privacy that society

would recognize as legitimate, Defendant has not presented that situation. Defendant knew that

Aliko did not own the property and offered no evidence suggesting that he was aware of an

actual relationship between Aliko and the property owner. Defendant presented no evidence that

either he or Aliko had a lease agreement or paid rent. The wooden structure was also located "in

the bush," hidden from the road, making it even more unlikely that the owner of the property

knew about the wooden structure, let alone had given Aliko permission to erect it. These facts

---

[14] To the extent that *Martin* stands for the proposition that the legitimacy of a defendant's
expectation of privacy is established simply by consent from someone whom the defendant
believes "ha[s] the authority to extend such an invitation," this Court disagrees with that holding.
To hold that someone has an expectation of privacy based solely on their belief that the person
who gave him consent to be there had authority to do so would truncate the objectively
reasonable element from the expectation of privacy test. *See Greenwood*, 486 U.S. at 39-40
("An expectation of privacy does not give rise to Fourth Amendment protection, however, unless
society is prepared to accept that expectation as objectively reasonable."). A guest of burglar
taking up residence in someone's summer home might be said to have an expectation of privacy
simply because they thought the burglar was the owner. The Court finds that consent to be in a
place can connote an expectation of privacy, but only when it is reasonable to believe that the
person giving consent has the authority to do so.

15

were known to Defendant and make his expectation of privacy objectively unreasonable.[15] The Court finds that, in circumstances such as this, where an individual has significant reason to doubt the lawfulness of his residence, society is not prepared to recognize an expectation of privacy in that residence. Because Defendant has not shown that society is prepared to recognize his claim of privacy in the wooden structure, he has failed to carry his burden to show that he has standing to contest the alleged search and his motion to suppress as to the gun, bullets, vial of crack, cash found on him and marijuana plants found growing outside the shack must be denied.[16] *Rakas*, 439 U.S. at 143, n. 12; *Stearn*, 597 F.3d at 551; *Baker*, 221 F.3d at 441.

---

[15] Defendant relies heavily on the facts that Defendant actually lived in the wooden structure, stored his personal belongings there, and had key to the lock on the door. However, that the wooden structure was a "residence" or "home" in the sense that it provided Defendant shelter from the elements and perhaps a place to secure his belongings does not resolve the question of whether society is prepared to recognize an expectation of privacy in that residence. As elaborated by the First Circuit in *Amezquita v. Hernandez-Colon*, 518 F.2d 8, 12 (1st Cir. 1975) cert. denied, 424 U.S. 916 (1976):

> Whether a place constitutes a person's home for [Fourth Amendment protection] purposes cannot be decided without any attention to its location or the means by which it was acquired; that is, whether the occupancy and construction were in bad faith is highly relevant. Where the plaintiffs had no legal right to occupy the land and build structures on it, those *faits accomplis* could give rise to no reasonable expectation of privacy even if the plaintiffs did own the resulting structures.

[16] While Defendant lacks standing to contest VIPD's initial observation of him and the alleged search of the wooden structure and its curtilage, Defendant nonetheless has standing to contest the search of the closed containers (i.e. pillowcase) found inside the wooden structure. *See Government of Virgin Islands v. Rasool,* 657 F.2d 582, 589 (3d Cir. 1981) (noting that a person has an expectation of privacy in a closed, opaque container); *State v. Mooney*, 588 A.2d 145, 152-54 (Conn. 1991) (finding privacy right in a duffel bag and a closed box containing personal items stored under a bridge but not in the under-the-bridge area where the bag and box were stored). Here, however, police testified that Defendant told them the precise location of the money and asked them to retrieve it. (Hr'g Tr. at 25:6-24.) Defendant's claim that he did not give consent is inconsistent with his admission that he volunteered the location of the cash because he thought police "needed to know." (*Id*. at 39:14-23.) The Court finds that Defendant consented to police retrieving the cash found in the pillowcase. Accordingly, it is admissible.

### b. Even if Defendant Had An Expectation of Privacy in the Wooden Structure and its Curtilage, the Evidence Found By Police is Still Admissible

"Official conduct that does not compromise any legitimate interest in privacy is not a search subject to the Fourth Amendment." *See Illinois v. Caballes*, 543 U.S. 405, 408 (2005) (internal quotations omitted) (holding that drug dog sniff conducted during lawful traffic stop did not violate Fourth Amendment). "The Fourth Amendment, which prohibits unreasonable searches and seizures by the government, is not implicated by entry upon private land to knock on a citizen's door for legitimate police purposes unconnected with a search of the premises." *United States v. Taylor*, 458 F.3d 1201, 1204 (11th Cir. 2006) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 466 (1971)). "[W]hen the police come on to private property to conduct an investigation or for some other legitimate purpose and restrict their movements to places visitors could be expected to go (e.g., walkways, driveways, porches), observations made from such vantage points are not covered by the Fourth Amendment." *Estate of Smith v. Marasco*, 318 F.3d 497, 519 (3d Cir. 2003) (quoting Wayne R. LaFave, 1 Search and Seizure: A Treatise on the Fourth Amendment § 2.3(f) (3d ed. & Supp.2003)). "Officers are allowed to knock on a residence's door or otherwise approach the residence seeking to speak to the inhabitants just as any private citizen may." *Id.* at 518 (citing *Rogers v. Pendleton*, 249 F.3d 279, 289-90 (4th Cir. 2001)). "[T]he police cannot reasonably be expected to avert their eyes from evidence of criminal activity that could have been observed by any member of the public." *Greenwood*, 486 U.S. at 41.

While not squarely within the "knock and talk" rule discussed above, the Court finds that VIPD's initial observation of Defendant occurred when they were legitimately on the curtilage of

the wooden structure.[17]  Police encountered Defendant while searching the JFK Terrace area for a shooting suspect that had been spotted running into the bush in the immediate vicinity only minutes before.  Officer Richards testified that that they came upon the wooden structure as they were searching in the bush.  At the point that they first saw Defendant standing outside the wooden structure, their presence on the curtilage of Defendant's property was essentially unintentional, for a legitimate purpose (looking for a fleeing suspect), and limited to the area where any other visitor would have to cross in order to access Defendant's front door.  Moreover, as there was no fence keeping police out of the curtilage at the point they entered, it was not obvious to the police that they were even on his curtilage.  Accordingly, the Court finds that VIPD's initial observation of Defendant outside the wooden structure did not violate Defendant's Fourth Amendment rights. *Estate of Smith,* 318 F.3d at 519.

Once VIPD observed Defendant, they were permitted to question him.  *United States v. Valentine*, 232 F.3d 350, 356 (3d Cir. 2000) ("[I]t is well established that officers are allowed to ask questions of anyone--and gun owners are no exception--without having any evidence creating suspicion.").  "The Supreme Court has made clear that a Fourth Amendment 'seizure does not occur simply because a police officer approaches an individual and asks a few questions.' . . . These encounters of short duration that do not amount to Fourth Amendment seizures can be characterized as 'consensual' because the citizen has the ability to engage in or terminate the encounter." *United States v. Crandell*, 554 F.3d 79, 84 (3d Cir. 2009) (quoting *Florida v. Bostick*, 501 U.S. 429, 434 (1991)).

---

[17] As defined by the Supreme Court, curtilage is "the area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life." *Oliver v. United States*, 466 U.S. 170, 180 (1984).  The Court assumes that the area where Defendant was found was within the curtilage of the wooden structure.

Whether an encounter is a seizure or consensual depends on the totality of the circumstances including "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (citations omitted). Defendant testified that when police approached he did not tell them they had to leave or refuse to answer any of their questions. (Hr'g Tr. 45:12-17.) He stated that police did not act hostile toward him (*id*. at 45:18-46:1) or threaten him and that he was not afraid of them. (*Id*. at 47:13-48:6.) Defendant testified that police did not touch or "search" him until after he stated that he possessed a firearm. (*Id*. at 45:20-46:1.) The Court finds that, under the totality of the circumstances, the initial encounter between Defendant and police was consensual.

Defendant testified that when he was approached, Officer Huertas had his gun drawn but pointed at the ground. The Court does not find Defendant credible on this point. However, even assuming that Officer Huertas did have his gun drawn, when police first saw Defendant and observed that he matched the description of the fleeing suspect provided by Officer Benitez, they had reasonable suspicion to briefly detain Defendant for the purposes of investigating whether he was one of the individuals who discharged gunshots in the Harborview Apartments. *United States v. Johnson*, 592 F.3d 442, 452 (3d Cir. 2010) ("[W]hen an officer has a reasonable basis for believing that the individual ... is armed and presently dangerous, he may take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." (quoting *Terry v. Ohio*, 392 U.S. 1, 23 (1968))). Here, Defendant matched not only the description of the suspect, but was seen in the same housing project, and

was located in the same direction (west) that Officer Benitez stated the suspect was fleeing. *United States v. Roberson*, 90 F.3d 75, 77 (3d Cir. 1996) (noting that "an officer's ability to corroborate significant aspects of the tip, and the tip's ability to predict future events" could provide reasonable suspicion for a *Terry* stop) (citing *Alabama v. White*, 496 U.S. 325 (1990)). Officer Benitez himself had reasonable suspicion to detain the fleeing suspect as that individual matched the description of the shooting suspect given to him by central dispatch and fled when seen by Benitez. *United States v. Brown*, 448 F.3d 239, 251 (3d Cir. 2006) (noting that "a suspect's nervous, evasive behavior, or flight from police" can serve to corroborate a tip and establish reasonable suspicion) (citing cases). Thus, even if Officer Huertas had his gun drawn, and the encounter between VIPD and Defendant a "seizure," VIPD had reasonable suspicion to *Terry* stop Defendant.[18]

After stating that he had a firearm on him, VIPD placed Defendant under arrest.[19] The evidence found by police on Defendant, including the gun, bullets, $177 in cash, and a vial of

---

[18] For these reasons, the Court finds that VIPD's question to Defendant about whether he had anything on him that they needed to know about also falls within the public safety exception. *See New York v. Quarles*, 467 U.S. 649, 655 (1984). Under the public safety exception, "[t]he dispositive question here is whether, considering all the circumstances, it was objectively reasonable for [police] to have thought that asking [defendant] whether the object indeed was a gun was necessary to protect himself, his partner, or the public from immediate danger." *United States v. Duncan*, 308 Fed.Appx. 601, 605-606, 2009 WL 215353, at *4 (3d Cir. 2009) (unpublished). Here, for the same reasons that police had reasonable suspicion to *Terry* stop Defendant, they also had justification for eliciting information about whether he was armed.

[19] After Defendant admitted possessing a firearm, Police had probable cause to arrest Defendant. As discussed above, VIPD had reasonable suspicion that Defendant was the shooting suspect seen fleeing by Officer Benitez. His matching the description of the fleeing suspect combined with his statement that he possessed a firearm was sufficient to give VIPD probable cause to suspect that Defendant had committed a crime (discharging shots) and to search him. *See United States v. Cruz*, 910 F.2d 1072, 1076 (3d Cir. 1990) ("Probable cause exists where the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be

crack were found during a search incident to arrest and are therefore admissible. *See Chimel v. California*, 395 U.S. 752, 762-763 (1969) ("When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape . . . In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction."); *United States v. Myers*, 308 F.3d 251, 266 (3d Cir. 2002) (search incident to arrest must "limited to the arrestee's person and to the area within his immediate control, meaning the area from which he might gain possession of a weapon or destructible evidence.") (citation omitted).

### c. Defendant's Statements To the Police Are Admissible

Defendant also seeks to suppress the statements he made to the police including that he was growing marijuana plants, that he was selling drugs to make money, and that he wanted police to retrieve his money from inside the shack. *Under Miranda v. Arizona*, 384 U.S. 436 (1966), a defendant's statements made in the course of a custodial interrogation are not admissible as evidence unless the defendant receives appropriate warnings. Here, VIPD testified that after hearing that Defendant possessed a firearm, they handcuffed and mirandized him. (Hr'g Tr. 21:1-12.) Defendant himself testified that he was placed in handcuffs after indicating that he had a "steel" on him and that he was advised of his rights after he was arrested (*Id.* at 35:15-36:3; 37:4-7.) The statements Defendant seeks to suppress were made by Defendant after

---

arrested."); *see also United States v. McIntosh,* 289 F.Supp.2d 672, 676 (D.V.I. 2003) (probable cause established by possession of firearm and suspicious behavior). Thus, this is not a situation such as in *United States v. Ublies*, 224 F.3d 213 (3d Cir. 2000), where the only basis for reasonable suspicion was a tip that defendant possessed a firearm while attending the J'ouvert Carnival in St. Thomas. *Id.* at 218; *see also Valentine*, 232 F.3d at 356-57.

he was mirandized. Defendant does not contend that he did not understand his rights or that his statements were involuntary. Accordingly, the Court finds that Defendant intelligently waived his *Miranda* rights and his statements are thus admissible.

## III. Conclusion

Defendant Jose Murray has not met his burden of showing that he had a reasonable expectation of privacy in the curtilage of the wooden structure where he was first observed by police. He therefore lacks standing to contest the alleged search conducted by VIPD. But even assuming that Defendant has standing to bring this Motion, VIPD was legitimately on the curtilage of the wooden shack when they first observed him and permissibly questioned him. After questioning him, VIPD had probable cause to arrest Defendant and the items he seeks to suppress were found during a lawful search incident to arrest. In addition, the statements that he seeks to suppress were made after he was mirandized and are therefore admissible.

For the foregoing reasons it is hereby,

**ORDERED** that Defendant's Motion to Suppress is **DENIED**.

**ENTERED this 2nd day of August, 2010**.

_____/s/_____
RAYMOND L. FINCH
SENIOR U.S. DISTRICT JUDGE